**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| TRAVELERS CASUALTY AND | ) | |
| SURETY COMPANY OF AMERICA, | ) | |
|     Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 06cv11318-NG |
|  | ) | |
| MASSACHUSETTS TURNPIKE | ) | |
| AUTHORITY, | ) | |
|     Defendant. | ) | |

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT, TO STRIKE, AND FOR HEARING**
March 31, 2009

**I.  INTRODUCTION**

This is an action for declaratory judgment brought by Travelers Casualty and Surety Company of America ("Travelers"). It claims that, in paying the full penal sum of a performance bond ("the Bond") to the defendant, the Massachusetts Turnpike Authority ("MTA") after the default of its principal contractor Shaw Construction Corporation ("Shaw"), Travelers discharged all liability as surety under the Bond. The penal sum, according to Travelers, is the limit of its exposure as surety. The MTA counters that the clear language of the Bond requires Travelers to insure that the construction work is completed, whatever the cost. It has counterclaimed for declaratory judgment, breach of contract and injunctive relief.

Both sides have moved for summary judgment.

**II.  FACTS**

On November 21, 2003, the MTA hired Shaw to repair bridge substructures and perform other incidental work. On December 11, 2003, Travelers issued a performance bond for the project on behalf of Shaw, as principal, to the MTA, as obligee. The Bond contained two

provisions that lie at the center of this dispute. The first provision (the "penal bond" provision) states that Shaw (as Principal) and Travelers (as Surety)

> are held and firmly bound unto the Massachusetts Turnpike Authority, as Obligee, in the sum of Nine Hundred and Thirteen Thousand Dollars and No Cents ($913,000), lawful money of the United States of America, for the payment whereof the Principal and the Surety bind themselves, their respective successors and assigns, jointly and severally, firmly by these presents.

Compl., Ex. A at 1 (document # 1-2). The $913,000[1] is known as the penal sum. The second provision (the "completion provision") states:

> In the event, that the Contract or any work thereunder is abandoned by the Principal, or whenever under the provisions of said Contract the Obligee terminates the employment of the Principal or the authority of the Principal to continue the Work, said Surety hereby agrees that said Surety shall, if requested in writing by the Obligee, promptly and expeditiously take such action as is necessary to complete said Contract by engaging persons other than the Principal, unless otherwise agreed by the Obligee in writing.

Id.

Shaw had difficulty completing the repairs on time. Its deadline was the end of October 2004; by January 2005, it had completed less than one-third of the work. After discussions lasting through May 2005, the MTA terminated Shaw's employment. On May 18, 2005, the MTA sent a letter (as required by the terms of the Bond) to Travelers stating that Shaw had "violated various provisions of the Contract and unreasonably delayed the prosecution of the

---

[1] Standard practice for sureties is to issue the bonds in the same amount as the value of the underlying contract. Thus, the obligee's contract funds, together with the bond amount, give the obligee 200% protection against the principal's default. See 4 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner and O'Connor on Construction Law § 12:21 (2008). In this case, Shaw had successfully bid $913,000 to complete the repair work.

Work." It requested that Travelers "take the appropriate action necessary to complete this Contact [sic]." Def.'s Answer & Countercl. Ex. 2 at 2 (document # 8-3).

Neither party disputed Travelers' liability under the performance Bond. Travelers agreed to solicit bids from new contractors to determine the cost of completing the project and hired a consultant, Kevin Ouellette, to assist in this process. Travelers received two bids in August 2005, the first for $1,846,837 and the second for $2,997,943. Though some of the work had already been completed at this point, these bids were significantly higher than the $913,000 Shaw originally bid in 2003, which amount had formed the basis for the penal sum Travelers included in its bond. See supra n. 1. On November 7, 2005, representatives from the MTA and Travelers met to discuss revising the repair specifications to lower the cost of completion; the MTA later agreed to make revisions.

In the midst of these negotiations, on January 26, 2006, the MTA informed Travelers that three areas of work that were outstanding under the contract required immediate attention due to safety concerns. Travelers agreed in writing on February 6, 2006, that the MTA could find another contractor to complete this "force account work"[2] as quickly as possible; and Travelers would subsequently reimburse the MTA for the cost. Posner Aff. May 30, 2008, Ex. O at 2 (document # 22-15); Posner Aff., Ex. P at 2 (document # 22-16).

After receiving the revised specifications from the MTA on the original contract, apart from the "force account work," Travelers solicited a second round of bids on April 21, 2006. Four bids came in, the lowest at $1,407,001. On May 24, 2006, Oullette sent an analysis of the

---

[2] "Force account work" is a term used in construction law to describe work done outside of the original contract and for which a price has not been fixed at the outset. Compensation is determined after the completion of the work, typically based upon formulas that result in the contractor receiving costs plus a fee. See 2 Bruner & O'Connor, Jr., § 6:84.

total projected costs to Travelers, including the force account work for which Travelers had to reimburse the MTA. He determined that even with the lower second round bid, the cost of completion still exceeded the amount of funding available by $224,980. Oullette's calculations were as follows:

| Costs[3] | | Funds Available | |
|---|---|---|---|
| Lowest bid | $1,407,001 | Bond Amount | $913,000 |
| Force account | $137,620 | Remaining Contract Balance | $586,641 |
| Concrete adjustment | $30,000 | TOTAL | $1,499,641 |
| Contingency | $100,000 | | |
| CM cost | $50,000 | | |
| TOTAL | $1,724,621 | | |

TOTAL COSTS:     $1,724,621

TOTAL FUNDING:  $1,499,641

$224,980

Posner Aff., Ex. T at 3 (document 22-20).

After reviewing the second round of bids, the MTA took the position in June 2006 that Travelers was required to complete the contract under the second provision of the Bond, the completion provision, see supra, regardless of whether the cost of completion exceeded the penal sum. Def.'s Answer & Countercl. Ex. 3 at 2 (document # 8-4). Travelers responded that it

---

[3] Oullette's memo provided a detailed explanation of these additional costs, which were not included in the bidding process ("concrete adjustment," "contingency," and "CM cost"). See Posner Aff., Ex. T at 3 (document # 22-20).

would not undertake to complete the project because the cost of completion exceeded the penal sum, which it considered the limit of its liability as surety. Travelers unconditionally tendered a check in the full amount of the penal sum, $913,000, to the MTA on July 28, 2006, and filed this suit for declaratory judgment July 31, 2006. The MTA counterclaimed for breach of contract and declaratory judgment, seeking an injunction ordering Travelers to complete the work or full damages for the cost of completion.

Both parties moved for summary judgment on May 30, 2008. Pl.'s Mot. Summ. J. (document # 19); Def.'s Mot. Summ. J. (document # 23). On October 8, 2008, Travelers filed a motion for a hearing on the pending cross-motions for summary judgment. Pl.'s Mot. Hr'g (document # 32).[4]

### III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

#### A. Legal Standards

##### 1. Summary Judgment

Summary judgment appropriately disposes of a claim when the pleadings, depositions, interrogatory responses, admissions, and affidavits on file suggest that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)). A disputed fact is material if it has "the potential to affect the outcome of the suit under the governing law." Hinchey v. Nynex Corp., 144 F.3d 134, 139 (1st Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal quotations omitted). A genuine issue of fact exists when a reasonable jury could find for either party. Basic Controlex Corp., Inc. v. Klockner Moeller Corp., 202 F.3d 450, 453 (1st Cir. 2000).

---

[4] On November 5, 2008, Travelers also filed a motion to strike the exhibits attached to the MTA's reply memorandum of November 2, 2008. Pl.'s Mot. Strike (document # 34).

Cross motions for summary judgment do not require a different standard. Adria Int'l Group v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). In addressing each party's motion, the Court must take the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

### 2. Contract Interpretation

Both parties agree that Massachusetts law governs this dispute, and further that the interpretation of a contract is typically a question of law for the court. Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981) (citing Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970)). Only an ambiguous contract presents issues of fact for a jury.

Evidence of custom and practice cannot be used to vary the provisions of a policy unless the contractual language is ambiguous. See Newell-Blais Post # 443, Veterans of Foreign Wars of the U.S., Inc. v. Shelby Mut. Ins. Co., 396 Mass. 633, 638 (1986) (holding that recourse to extrinsic evidence was not required where the language of a contract term was clear and unambiguous). However, relevant custom and usage may be admissible to assist in policy interpretation on the theory that ordinary usage is incorporated into the policy. See Affiliated FM Ins. Co. v. Constitution Reinsurance Corp., 416 Mass. 839, 845 (1994). Nevertheless, even where custom and usage are admissible, the express terms of the contract necessarily take precedence. Somerset Savs. Bank v. Chi. Title Ins. Co., 420 Mass. 422, 427-28 (1995).

### B. Analysis

In the instant case, both parties agree that the underlying contract was breached when Shaw defaulted and that this breach triggered Travelers' responsibilities as surety. They disagree, however, as to whether the penal sum of the performance Bond represents the limit of Travelers' liability to the MTA.

Travelers argues that the "sole purpose" of stating the penal sum in the Bond is to fix the surety's liability. Allowing the surety to be held liable in excess of that amount would render the penal sum clause a nullity in violation of core principles of contract interpretation. While Travelers acknowledges that the Bond contains additional language regarding its obligation to see that the work is completed, it reads that provision as outlining its obligations in the event that it chooses to complete the work, not as exposing it to open-ended liability.

The MTA views the Bond as creating two separate and independent obligations: the payment of the penal sum and the completion obligation. In choosing to tender the penal sum, and not completing the work, the MTA alleges, Travelers exercised an option it did not possess.

    **1.**    **Penal Sum As the Limit of Liability**

In order to determine what type of bond is at issue here, and the implications of its language, it is important to put this case in the context of other surety bonds. <u>Performance bonds</u> are used by the owners of construction projects to protect themselves against the risk that a contractor inexcusably fails to complete the contract in accordance with its terms. Typically a performance bond will define the performance *options* that are available to a surety in the event of a contractor's default. <u>Completion bonds</u> are a sub-set of performance bonds in which the <u>only</u> performance option available to the surety upon a principal's default is the takeover and completion of the underlying contract. 4 Bruner & O'Connor, Jr. §§ 12:1, 12:19.

Under both types of bond, the general rule is that the penal sum of the bond is the limit of the surety's financial exposure in the event of a contractor default. In the following performance bond cases (as distinguished from completion bond cases) even when the cost to complete the underlying work exceeded the penal sum of the bond, the surety's liability was capped at the penal sum. For example, in <u>Brown v. London & Lancashire Indem. Co.</u>, a jury found that the plaintiff incurred damages exceeding the penal sum of the bond, but the court held the surety liable only for the penal sum. 249 Mass. 511, 516 (1924). The Supreme Judicial Court upheld the superior court's decision, stating that the surety cannot be held liable for any amount over the penal sum "no matter how great may be the damages sustained by the obligee." <u>Id.</u> Similarly, in <u>Union Mkt. Nat'l Bank v. Nonantum Inv. Co.</u>, where the damages sustained by a plaintiff exceeded the penal sum of the bond, a judge ruled that the plaintiff was entitled to recover the penal sum, with interest thereupon from the time of default, but no more. 291 Mass. 439, 444 (1935). In <u>Peerless Ins. Co. v. S. Boston Storage & Warehouse, Inc.</u>, property owners who had suffered damage to goods held in the principal's warehouses argued that the language of the public warehousemen's licensing bond made the surety liable for all claims filed against it on a "per occurrence" basis, even when such an interpretation would lead to liability in excess of the penal sum. 397 Mass. 325, 327 (1986). The court rejected this "per occurrence" interpretation as inconsistent with the "general rule" that the penal sum limited the recovery. It held that "while the statute requiring the licensing and bond of public warehousemen was undoubtedly enacted for the protection of those persons who store goods in such warehouses," it could not be construed so liberally as to place upon the surety liability it had not assumed in its contract. <u>Id.</u>

To be sure, courts have found limited exceptions to this general rule. The MTA raises two: First, when a surety elects to take over the original contract and thereafter fails to fulfill its obligations, and second, when a surety's bad faith conduct results in additional consequential damages. Travelers maintains that neither applies here.[5]

The first exception recognizes that, in a takeover agreement, a surety effectively modifies the contract by agreeing to complete performance without regard to cost. See Employers Mut. Cas. Co. v. United Fire & Cas. Co., 682 N.W.2d 452, 457 (Iowa Ct. App. 2004). The logic is that if the surety elects to "step into the place of its principal and perform that principal's contract, it then makes itself subject to the principal's liabilities." Caron v. Andrew, 133 Cal. App. 2d 402, 410-11 (1955); see also Fed. Sur. Co. v. Lalonde, 31 F.2d 673, 674 (9th Cir. 1929).

The MTA, citing to Int'l Fid. Ins. Co. v. Wilson, 387 Mass. 841 (1983), argues that Travelers effected such a takeover. In Wilson, for example, the surety voluntarily took over the underlying contract, incurred costs in excess of the penal sum during completion, and then sued the principal who had defaulted to recover those excess costs under an indemnity agreement. Id. at 843-44. But no such takeover ever occurred in this case. Posner Aff., Ex. C at 13 (document # 22-3). Travelers did not voluntarily step into Shaw's place or incur costs in excess of the penal sum. Nor did its solicitation of bids constitute a takeover of Shaw's contract. It did so merely to evaluate the cost of completion. In fact, Travelers was explicit in its communications with the MTA throughout the solicitation process that it would not take over the contract if the cost of doing so could not be lowered beneath the penal sum. Posner Aff., Ex. L at 2 (document # 22-12).

---

[5] Courts have recognized more exceptions than the two briefed by the parties, but none are relevant to the case at bar. See 4 Bruner & O'Connor, Jr., § 12:21.

The second exception, bad faith, rests on the theory that a surety bond includes an implied duty of good faith and fair dealing.  Where an obligee suffers damages not foreseen when the bond was issued due to the surety's wrongful conduct, the ordinary measure of damages for breach of contract would be inadequate.  See Cont'l Realty Corp. v. Andrew J. Crevolin Co., 380 F. Supp. 246, 254-56 (S.D. W.Va. 1974); United States v. Seaboard Sur. Co., 817 F.2d 956, 964 (2d Cir. 1987).

Relying on Crevolin, the MTA argues that Travelers' failure to fulfill the underlying contract pursuant to the completion language in the Bond amounts to bad faith, and that the delay "adversely affects the scheduling and cost" of other maintenance projects on the Turnpike planned to follow the work contracted to Shaw.  Crevolin, however, is distinguishable.  In Crevolin, the bond at issue stated that in the event of default by the principal, the surety would either take over the contract within fifteen days or pay the obligee the "reasonable cost of completion, less the balance of the contract price."  Crevolin, 380 F. Supp. at 251.  The surety refused to exercise either option under the bond and denied all liability after concluding that the obligee had breached its own contractual duties.  Id. at 250.  It even violated the court's preliminary injunction ordering it to comply with the bond.  Its decision to "do nothing" upon the principal's default caused the obligee to incur damages in excess of the penal sum (when damages had initially been beneath the penal sum).  Id. at 252-53.  The court found this conduct to be "tantamount to bad faith."  Id. at 254.  It held the surety liable for the penal sum due to the principal's breach and all actual damages incurred due to the surety's own breach.  Id. at 256.

Travelers' conduct does not begin to approach the bad faith exhibited by the surety in Crevolin.  Travelers' response to notice of its principal's default -- conducting an investigation

into the cost of completion, negotiating down the cost of the contract with the MTA, and promptly tendering the penal sum upon determining that completion would be too expensive even after the revised specifications -- was timely and not indicative of bad faith.  Thus, in the ordinary case, Travelers' liability would be limited to the payment of the penal sum.

### 2. Meaning of the Bond's Completion Language

The problem, however, is the language of the completion clause.  The completion clause plainly obligates the surety to take certain actions -- not just to pay the amount of the penal sum.  The surety agrees to "promptly and expeditiously take such action as is necessary to complete said Contract by engaging persons other than the Principal."  Compl., Ex. A at 1 (document # 1-2).  Thus, MTA argues that the penal sum clause and the completion clause create two entirely independent obligations.  Where the clear language of the Bond imposes an unconditional completion obligation on the surety, the MTA alleges the surety must complete the work no matter the cost.  In effect, it argues that a completion provision of this kind negates the general rule that the penal sum is the limit of liability.  Neither the language of the Bond, nor the case law, however, support this contention.

First,  the MTA's interpretation of the Bond -- that the completion language creates an independent, non-defeasible obligation -- renders the penal sum a nullity in certain situations.  If the principal does not default on the underlying contract, then the Bond is unnecessary and the penal sum need not be paid.  If the principal does default, and the obligee demands completion, the surety must complete the work no matter what the cost.  The penal sum is irrelevant.  Clearly, the construction of an agreement that renders any provision a nullity is disfavored, as every word

and phrase should be given meaning, if possible.  Fed. Deposit Ins. Corp. v. Singh, 977 F.2d 18, 22 (1st Cir. 1992); Davis v. Dawson, 15 F. Supp. 2d 64, 109 (D. Mass. 1998).

The best interpretation is one that gives effect to both the penal sum provision and the completion provision, such as this:  The penal sum provision describes the greatest amount of money the surety would be required to pay in the event of the principal's default.  The completion provision describes the acts the surety is required to take, should the obligee require it.  Reading the two together, the surety agrees to take the required actions but in no event pay more than the penal sum.

To be sure, where the costs of completion are more than the penal sum -- as here --  the surety has every incentive to ignore the completion provision, default, and simply pay the money.  This  result is due in part to the rare combination of three factors:  The bond at issue is a completion bond in which the surety's only performance option is to take over and complete the contract.  The cost to complete that underlying work exceeds the penal sum.  And, this is an action for declaratory relief, before any damages have been incurred.  But just because the results are anomalous in this case does not suggest that the interpretation is wrong.  For example, where the costs of completion are less than the penal sum, which is the usual case, the completion clause may well be significant.[6]

Indeed,  even though the case law interpreting completion clauses typically involves instances in which the cost of completion is less than the penal sum,  the language of the

---

[6] Completion costs should not usually exceed the penal sum, because the obligee usually has 200% protection against the principal's default.  See supra n.1.  Moreover, completion language can still play a meaningful role even when completion costs exceed the penal sum.  For example, when a company is surety both for the defaulting sub-contractor and the general contractor who would ultimately be liable, it may well complete the contract.

decisions is instructive. In Trainor Co. v. Aetna Cas. & Sur. Co., for example, the Supreme Court held that the surety for a construction company that had incurred an absolute duty to erect certain buildings had made a completion guaranty to the obligee. 290 U.S. 47, 55 (1933). However, when the construction company defaulted, the surety owed the obligee "the difference between the value of the unfinished buildings and their value as it would have been if completed in accordance with the agreement . . . but exceeding neither the amount due on its debt nor the amount of the bond." Id. at 55-56 (emphasis added). Likewise, in Purdy v. Massey, the defendant issued a bond that amounted to an "absolute undertaking to erect and complete" a building. 306 Pa. 288, 293 (1932). The court held that the "only alternative for performance [was] the bond itself." Id. at 294-5. Having failed to perform, the surety was liable for the loss sustained by the plaintiff, but only up to the amount of the bond. Id. at 294-95.[7] In Moore v. Md. Cas. Co., an obligee sued a surety for the penal sum of its bond, which contained a completion duty, when the surety refused to complete the work after the principal's default. 12 F. Supp. 90, 91-92 (D. Mass.1935), aff'd on other grounds, 82 F.2d 189 (1st Cir. 1936). The court found the surety liable, but because the actual damages sustained by the obligee were less than the penal sum of the bond, execution issued only for those actual damages. Id. at 96. Even where a performance bond is replaced by a completion bond midway through the construction of a building, the remedy for an owner who is forced to complete after a surety fails to do so is still judgment for the penal sum of the completion bond and not injunctive relief. Province Sec. Corp. v. Md. Cas. Co., 269 Mass. 75, 86-87, 92 (1929).

---

[7] Indeed, the court in Purdy characterized the bond as a "guaranty bond, an affirmative covenant to complete the building in event of default by the principal. . . . " 306 Pa. at 294. Notwithstanding that characterization, the penal bond was the limit of the surety's liability.

The MTA nevertheless argues that the language of this Bond is unique, and uniquely precludes Travelers from arguing that it has the option of paying the penal sum instead of the full cost of completion. It points to three performance bonds,[8] two of which were issued by Travelers with respect to other contracts, that unambiguously give the surety the option to either pay the penal sum or complete the underlying contract. Since Travelers was familiar with these other bonds, the argument goes, its failure to include similar language in the Shaw Bond suggests that it was absolutely bound to the completion obligation, regardless of the cost. Travelers counters that consideration of these additional bonds is barred by the parol evidence rule, which precludes consideration of extrinsic evidence unless the relevant contract provisions are ambiguous.

To be sure, the Bond is ambiguous to the extent that it does not make clear how to read the penal sum provision and the completion obligation together when the cost of completion exceeds the penal sum. But the other performance bonds do not resolve that question. They address what the surety must do, not what it must pay. They suggest that where the work is unfinished, as in the instant case, the surety cannot opt to pay rather than complete the work.[9]

Since Travelers seeks declaratory relief, I interpret the Bond so as to give meaning to the completion obligation without extending the surety's liability beyond the penal sum. I find that

---

[8] Def.'s Mem. Summ. J. at 10 (document # 26); Def.'s Statement of Material Facts, Ex. 4 at 3-4 (document # 25-4); Ex. 9 at 1-3 (document # 25-9).

[9] In that respect, this case is different from others where the owner or obligee had already paid to complete and the only question was the measure of damages for the default. Trainor, 290 U.S. at 55; Moore, 12 F. Supp. at 91-92; Province, 269 Mass. at 84.

the surety must complete the work,[10] but that its financial obligations may go no further than the penal sum.

Perhaps recognizing that Traveler's monetary obligations may be limited by the penal sum clause, the MTA wants more than a declaration; it seeks injunctive relief, in effect, specific performance of the Bond's performance obligations. I decline to so order. In cases such as this, where an adequate legal remedy exists, namely the payment of the penal sum, which has already been tendered, injunctive relief is inappropriate. Atlantech Inc. v. American Panel Corp., 540 F. Supp. 2d 274, 285 (D. Mass. 2008).

## IV. CONCLUSION

The Court therefore **GRANTS IN PART and DENIES IN PART** the Plaintiff's Motion for Summary Judgment (**document # 19**) on declaratory relief: While Travelers is obligated to arrange for completion of its principal's contract, its liability to the MTA under this Bond does not exceed the $913,000 penal sum. The Court also **GRANTS IN PART and DENIES IN PART** the Defendant's Motion for Partial Summary Judgment (**document # 23**): Travelers is in breach of its obligation to the MTA under the Bond by failing to fulfill its completion obligation up to the limit of its liability, e.g., the penal sum. However, the Court will not enter a mandatory injunction requiring Travelers to complete the work under the contract; tendering the penal sum represents an adequate remedy at law.

The MTA has failed to persuade the Court that the Bond at issue in this case falls under any of the narrow exceptions to the general rule that the penal sum is the limit of liability, and

---

[10] Should Travelers opt to take over Shaw's contract, it does so pursuant to the Court's interpretation of the Bond. Its actions cannot be construed as opening itself up to liability beyond the penal sum of the Bond as in the cases described infra where the surety has voluntarily taken over the work.

has advanced an untenable interpretation of the terms of contract.  Because Travelers tendered the Bond's entire penal sum before suit, the MTA is not entitled to interest on it. [11]

**SO ORDERED.**

Date:  March 31, 2009                    /s/Nancy Gertner
                                         **NANCY GERTNER, U.S.D.C.**

---

[11] Since no hearing is necessary,  Travelers' motion for a hearing (**document #32**) is **DENIED**.  On November 5, 2008, Travelers submitted a motion to strike two exhibits attached to the MTA's November 2, 2008, opposition to Travelers' motion for a hearing regarding the purported existence of an indemnity agreement between Travelers and Shaw as irrelevant, violative of the parol evidence rule, and barred due to their absence from the summary judgment record.  Def.'s Resp. to Pl.'s Mot. Hr'g (**document # 34**).  Since the Court based its conclusions on the evidence properly in the record, the Court finds that this motion is **MOOT**.